**STATE v. LANFORD**

[225 N.C. App. 189 (2013)]

STATE OF NORTH CAROLINA
v.
TODD LEWIS LANFORD, Defendant

No. COA12-623

Filed 15 January 2013

**1. Child Abuse, Dependency, and Neglect—malicious castration—assault—sufficient evidence**

The trial court did not err by denying defendant's motion to dismiss the charges of attempted malicious castration, assault by strangulation, multiple counts of assault with a deadly weapon inflicting serious injury, and felonious child abuse because there sufficient evidence of each element of every crime charged and evidence that defendant was the perpetrator.

**2. Constitutional Law—right to confrontation—juvenile witness testimony—closed-circuit television**

The trial court did not err in a child abuse case by granting the State's motion to allow the juvenile victim to testify outside defendant's presence via closed-circuit television (CCTV). Pursuant to *State v. Jackson*, 216 N.C. App. 238, 717 S.E.2d 35 (2011), the use of one-way CCTV to procure the victim's testimony did not inhibit defendant's ability to confront his accuser in violation of the Constitution, despite the lack of face-to-face confrontation, where the trial testimony was subjected to rigorous adversarial testing by defendant's attorney. Further, the trial court's findings of fact underlying its decision to permit use of CCTV were supported by the evidence.

Appeal by defendant from judgments entered on or about 5 August 2011 by Judge Gregory A. Weeks in Superior Court Cumberland County. Heard in the Court of Appeals 13 December 2012.

*Attorney General Roy A. Cooper, III by Assistant Attorney General Anne M. Middleton, for the State.*

*Glover & Petersen, P.A. by Ann B. Petersen, for defendant-appellant.*

STROUD, Judge.

## I. Background

During the summer of 2008, Todd Lanford ("defendant") moved in with Tiffany and her then eleven-year-old son Joseph[1] While Tiffany worked during the day, defendant stayed home most of the time and would babysit Joseph when he stayed home from school. Defendant first started disciplining Joseph with grounding, but after approximately three months, defendant began to hit Joseph when he did something that defendant did not like. The violence escalated and during the last week of October 2008 defendant hit and kicked Joseph so badly that he stayed home from school the entire week. Earlier in October, Joseph's neighbors had begun noticing bruises and just before Halloween 2008 Tiffany finally showed one of those neighbors the extent of the bruising on Joseph's side. Tiffany initially refused to divulge how he got the bruises, alternatively attributing them to Joseph's restless sleep, falling out of bed, or spirits attacking him at night.

The Cumberland County Department of Social Services (DSS) was called to investigate. When a DSS social worker arrived at Tiffany's house, she answered the door and let the social worker talk to Joseph. She immediately noticed extensive bruising on Joseph's face, including two black eyes. Joseph claimed that he got the black eyes from thrashing in bed and hitting the ladder on his bunk bed. The DSS social worker had Tiffany and defendant take Joseph to the hospital to be examined. After an initial examination, Dr. Sharon Cooper, a pediatrician specializing in treating abused children, was called in to examine Joseph. When Dr. Cooper examined Joseph she discovered thirty-three distinct injuries, including bruises on his face, sides, legs, knees, buttocks, abdomen, chest, and a 2.5 inch laceration on Joseph's penis. Dr. Cooper recognized that these injuries were consistent with abuse and that there was no possibility that these injuries occurred accidentally.

When asked by the investigating detective, Tiffany denied hitting Joseph and denied knowing how Joseph was hurt. Joseph also initially refused to explain who beat him. After some conversations with Joseph, Joseph explained that he began getting bruises shortly after defendant moved in and denied that his mother hit him. When Dr. Cooper saw Joseph at a later follow-up session, Joseph identified defendant as the one who had been hitting him.

---

1. To protect the identities of the juvenile and his mother and for ease of reading we will refer to both of them by pseudonym.

Defendant was indicted for and the State proceeded to trial on one count of attempted malicious castration of a privy member, four counts of felony child abuse, three counts of assault with a deadly weapon inflicting serious injury, one count of first degree statutory sex offense, one count of indecent liberties with a child, one count of assault by strangulation, and one count of misdemeanor communicating threats. The case went to jury verdict and the jury found defendant guilty of all charges. Defendant was sentenced to consecutive periods of confinement of 288 to 355 months for the sex offense charges, 29 to 44 months for the assault with a deadly weapon inflicting serious injury, felony child abuse and communicating threats charges, and 77 to 102 months confinement for attempted malicious castration, and the linked assault with a deadly weapon inflicting serious injury and felony child abuse charges. Defendant gave timely notice of appeal in open court.

## II. Sufficiency of the Evidence

[1] Defendant first argues on appeal that the trial court erred in denying his motion to dismiss all the charges against him because there was insufficient evidence for a reasonable juror to find him guilty of attempted malicious castration, assault by strangulation, and multiple counts of assault with a deadly weapon inflicting serious injury, and felonious child abuse. For the following reasons, we disagree.

## A. Standard of Review

> The standard of review for a motion to dismiss is well known. A defendant's motion to dismiss should be denied if there is substantial evidence of: (1) each essential element of the offense charged, and (2) of defendant's being the perpetrator of the charged offense. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. The Court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve.

*State v. Teague,* ___ N.C. App. ___, ___, 715 S.E.2d 919, 923 (2011) (citation and quotation marks omitted), *disc. rev. denied,* ___ N.C. ___, 720 S.E.2d 684 (2012).

B. Attempted Malicious Castration

Defendant was indicted for attempted malicious castration under N.C. Gen. Stat. § 14-28 (2007). "There are two elements to the crime of attempt: there must be the intent to commit a specific crime and an overt act which in the ordinary and likely course of events would result in the commission of the crime." *State v. Rushing*, 61 N.C. App. 62, 67, 300 S.E.2d 445, 449 (citation omitted), *aff'd*, 308 N.C. 804, 303 S.E.2d 822 (1983). The elements of malicious castration are:

(1)  The accused must act with malice aforethought.

(2)  The act must be done on purpose and unlawfully.

(3)  The act must be done with intent to maim or disfigure a privy member of the person assaulted.

(4)  There must be permanent injury to the privy member of the person assaulted.

*State v. Beasley*, 3 N.C. App. 323, 329, 164 S.E.2d 742, 746-47 (1968) (citations omitted). Thus, to prove that defendant committed the crime of attempted malicious castration, the State must prove (1) that the accused acted with malice aforethought, (2) that the act was done on purpose and unlawfully, (3) that the act was done with the specific intent to maim or disfigure a privy member of the person assaulted, and (4) that in the ordinary and likely course of events the act would result in permanent injury to the privy member of the person assaulted. Defendant only contends that there was insufficient evidence that he committed an assault on Joseph with malice aforethought and specific intent to maim Joseph's privy member.

Our Supreme Court has described malice as follows:

Malice has many definitions. To the layman it means hatred, ill will or malevolence toward a particular individual. To be sure, a person in such a state of mind or harboring such emotions has actual or particular malice. In a legal sense, however, malice is not restricted to spite or enmity toward a particular person. It also denotes a wrongful act intentionally done without just cause or excuse; whatever is done with a willful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means constitutes legal malice. It comprehends not only particular animosity but also wickedness of disposition,

hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person.

*State v. Wilkerson*, 295 N.C. 559, 578, 247 S.E.2d 905, 916 (1978) (citations and quotation marks omitted).

"Malice aforethought" means that the malice which motivated the criminal act preceded the act itself, not necessarily that defendant acted with premeditation and deliberation. *See State v. Smith*, 221 N.C. 278, 290, 20 S.E.2d 313, 320 (1942) ("It is clear, then, that the word 'aforethought' cannot be held to import into the definition the element of premeditation or deliberation. Indeed, it is rather definitely indicated that it relates rather to the prior existence of the malice which motivates the murder than to a previously entertained purpose.").

Like other mental states, malice "usually cannot be proven by direct evidence, but rather must be inferred from the defendant's acts, conduct, and inferences fairly deducible from all the circumstances." *State v. Goldsmith*, 187 N.C. App. 162, 165, 652 S.E.2d 336, 339-40 (2007) (citation and quotation marks omitted). Especially "[i]n the domestic relation, the malice of one of the parties is rarely to be proved but from a series of acts; and the longer they have existed and the greater the number of them, the more powerful are they to show the state of the defendant's feelings." *State v. Scott*, 343 N.C. 313, 331, 471 S.E.2d 605, 616 (1996) (citation, quotation marks, and brackets omitted).

Here, there was conflicting evidence about how the injury to Joseph's penis occurred. In court, Joseph testified that defendant stomped on his pelvic region, causing his pants to slide down and cut him. Joseph had previously told police that defendant had cut his penis with a knife. Detective Williams testified to Joseph's statement about the knife. The statement was not objected to by defense counsel, nor did the trial court issue a limiting instruction as to Joseph's prior statements to police. Those statements therefore were admitted for the truth of the matter asserted.[2]

Defendant's malice and specific intent to maim, without lawful justification or excuse, could be reasonably inferred from the numer-

---

2. We note that in considering a motion to dismiss "the trial court should consider all evidence actually admitted, whether competent or not, that is favorable to the State." *State v. Jones*, 342 N.C. 523, 540, 467 S.E.2d 12, 23 (1996) (citation omitted).

ous acts of humiliation and violence that Joseph testified he had been subjected to by defendant prior to defendant's assault on his privy member. Dr. Cooper testified that the bruises on the inside of Joseph's thighs were consistent with someone forcefully pulling the legs apart, an act normally associated with sexual abuse. Dr. Cooper further testified that "A person who hurts anybody's genitals often has gone beyond your typical just power and control, I just want to teach you a lesson. You are starting to get into a different motivation."

Joseph's testimony was consistent with this assessment. In addition to the series of assaults by fist and foot, Joseph related instances where defendant called him a " 'B' word", forced him into a dog cage and told him to act like a dog, and poured water on him to make him think that he had wet the bed. This evidence could lead a reasonable mind to conclude that defendant bore "hatred, ill will or malevolence toward" Joseph constituting actual and express malice preexisting and motivating defendant's assault on Joseph's privy member. *Wilkerson*, 295 N.C. at 578, 247 S.E.2d at 916; *see Scott*, 343 N.C. at 331, 471 S.E.2d at 616.[3]

Defendant argues that because the evidence only showed that he stomped on Joseph's privy member and that the scar came from Joseph's pants sliding down during that assault, a reasonable juror could not have inferred an intent to maim. Defendant need not have used a knife, however, for a reasonable juror to infer intent to maim. " 'A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts[.]' " *State v. Torain*, 316 N.C. 111, 117, 340 S.E.2d 465, 468 (quoting *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 1969-70, 85 L.Ed. 2d 344, 351 (1985)), *cert. denied*, 479 U.S. 836, 107 S.Ct. 133, 93 L.Ed. 2d 77 (1986). It is reasonable for a juror to conclude that a fully grown man stomping on the privy member of an eleven year old boy would, in the likely course of events, result in disfigurement and permanent injury to the privy member and that in doing so defendant intended to cause such injury.

We conclude that this series of acts, especially their frequency, nature, and escalating level of violence, could lead a reasonable juror to conclude that defendant had malice towards Joseph prior to the assault, that such malice motivated defendant to assault Joseph's privy member, and that in doing so defendant specifically intended to disfigure his penis, either by stomping on it or by cutting him with a

---

3. We do not hold that such express malice is required, only that it is sufficient.

knife and thereby to further humiliate and emasculate him. *See Scott,* 343 N.C. at 331, 471 S.E.2d at 616. Accordingly, we find defendant's argument on this point meritless and hold that the trial court did not err in refusing to dismiss the charge of attempted malicious castration.

C.  Assault by Strangulation

Defendant next challenges the sufficiency of the evidence with regard to assault by strangulation on two grounds. First, citing *State v. Braxton,* 183 N.C. App. 36, 643 S.E.2d 637, *disc. rev. denied,* 361 N.C. 697, 653 S.E.2d 4 (2007), defendant argues that strangulation requires a closing of the windpipe through the direct application of force to the throat, while here the evidence showed that defendant only pulled Joseph's head "back by one hand while his nose and mouth were covered by the other hand, making it difficult to breathe." Second, defendant contends that his conviction for assault by strangulation should be vacated because he was also convicted of assault inflicting serious injury for the same conduct.

In *Braxton,* we held that where the evidence showed that the defendant had "applied sufficient pressure to [the victim's] throat such that she had difficulty breathing," there was sufficient evidence to support a conviction for assault by strangulation. *Braxton,* 183 N.C. App. at 43, 643 S.E.2d at 642. We approved the trial court's instruction that "strangulation is defined as a form of asphyxia characterized by closure of the blood vessels and/or air passages of the neck as a result of external pressure on the neck brought about by hanging, ligator or the manual assertion of pressure." *Id.* at 42, 643 S.E.2d at 642 (citation omitted). We also noted other possible definitions of strangulation:

> Webster's Ninth New Collegiate Dictionary defines "strangulation" as "1: the action or process of strangling or strangulating[;] 2: the state of being strangled or strangulated; [especially]: *excessive or pathological constriction or compression of a bodily tube (as a blood vessel or a loop of intestine) that interrupts its ability to act as a passage.*" Webster's Ninth New Collegiate Dictionary 1164 (9th ed.1991). "Strangle" is defined as "1a: to choke to death by compressing the throat with something (as a hand or rope): THROTTLE[;] b: *to obstruct seriously or fatally the normal breathing of ...* [;] c: STIFLE[.]" *Id.*

*Id.* at 42, 643 S.E.2d at 641-42 (emphasis added).

Although the State correctly observes that in *Braxton* we did not require full closure of the air passages in the neck, *id.* at 43, 643 S.E.2d at 642, defendant does not argue that the State was required to prove that fact. Rather, defendant contends that the obstruction of the airway was caused by defendant's hand over Joseph's nose and mouth, rather than "external pressure" applied to the neck, and that therefore the action would be better classified as "smothering" than "strangling".

Joseph described this particular assault in the following exchange with the prosecutor:

> [PROSECUTOR]: When Todd would knock you onto the couch, how—did that hurt?
>
> [JOSEPH]: Huh-uh.
>
> [PROSECUTOR]: What did it do to your breathing?
>
> [JOSEPH]: I couldn't breathe.
>
> [PROSECUTOR]: What was keeping you from breathing?
>
> [JOSEPH]: His hand over my mouth and nose.
>
> [PROSECUTOR]: Would it be possible for you, [Joseph], to show the jury the way that he held his hand up to your face?
>
> [JOSEPH]: He was like that (indicating).

Dr. Cooper elaborated on Joseph's testimony by describing the injuries to his neck:

> there is a round mark right here and there is a green mark that goes underneath the chin. It is not here on the neck, the way we classically see the strangulation, but if you have a person who is strangling a child with a hand, the part of the hand is going to be right underneath the chin, this part of your hand. The lower part of your hand will be where we classically see a strangulation mark like a person would use a rope. So if you have a child who is being strangled with a hyperextension method, meaning the head is back and the person is strangling them in this manner, the imprint of that will be very high

on the neck. It will be just underneath the chin. And typ-
ically what we will see are just the fingerprint marks
from one side of the chin to the other.

Thus, there was evidence that part of the force which inhibited
Joseph's breathing during the assault was applied to the top of his
throat underneath his chin, or as Dr. Cooper described it, "strangled
with a hyperextension method." We do not believe that the statute
requires a particular method of restricting the airways in the throat.
Here, defendant constricted Joseph's airways by grabbing him under
the chin, pulling his head back, covering his nose and mouth, and
hyperextending his neck. Although there was no evidence that defend-
ant restricted Joseph's breathing by direct application of force to the
trachea, he managed to accomplish the same effect by hyperextend-
ing Joseph's neck and throat. The fact that defendant restricted
Joseph's airway through the application of force to the top of his neck
and to his head rather than the trachea itself is immaterial.

We find defendant's second argument similarly unconvincing.
N.C. Gen. Stat. § 14-32.4(b) states that a defendant is guilty of assault
by strangulation based on the described conduct "[u]nless the con-
duct is covered under some other provision of law providing greater
punishment." N.C. Gen. Stat. § 14-32.4(b) (2007). This Court has held
that "the language '[u]nless the conduct is covered under some other
provision of law providing greater punishment' indicate[s] legislative
intent to punish certain offenses at a certain level, but that *if the
same conduct* was punishable under a different statute carrying a
higher penalty, defendant could only be sentenced for that higher
offense." *State v. Williams*, 201 N.C. App. 161, 173, 689 S.E.2d 412,
418-19 (2009) (quoting *State v. Ezell*, 159 N.C. App. 103, 111, 582
S.E.2d 679, 685 (2003)) (emphasis added). However, where a defend-
ant is convicted of a lesser crime for one assault and a greater crime
for another, this language does not preclude punishment for each sep-
arate assault, although the defendant could have been charged with
the greater crime for each assault. *See State v. Roseborough*, 344 N.C.
121, 132, 472 S.E.2d 763, 770 (1996) ("The district attorney has broad
discretion to determine whether to try a defendant for first-degree
murder, or to try a defendant for a lesser offense[.]").

The evidence here, taken in the light most favorable to the State,
supports an inference that defendant strangled Joseph as part of an
assault separate from the other assaults charged. "In order for a
defendant to be charged with multiple counts of assault, there must
be multiple assaults. This requires evidence of a distinct interruption

in the original assault followed by a second assault." *State v. McCoy*, 174 N.C. App. 105, 115, 620 S.E.2d 863, 871 (2005) (citations and quotation marks omitted).

Although Joseph did not specify a date for each assault, it is reasonable to infer from his testimony that there were numerous assaults over a period of time. Joseph testified that defendant grabbed him by the neck and head in the manner described above on at least two separate occasions. Therefore, there was sufficient evidence, taken in the light most favorable to the State, that there were separate assaults with distinct interruptions, one of which could constitute an assault by strangulation. The fact that these assaults were part of a pattern of chronic abuse does not mean that they are considered one assault. Therefore, defendant's punishment for assault by strangulation is not precluded by his convictions on more serious assault charges and we hold that the trial court did not err in denying defendant's motion to dismiss or by declining to arrest judgment on the charge of assault by strangulation.

D. Multiple Counts of AWDWISI and Felony Child Abuse

As stated above, "for a defendant to be charged with multiple counts of assault, there must be multiple assaults. This requires evidence of a distinct interruption in the original assault followed by a second assault." *McCoy*, 174 N.C. App. at 115, 620 S.E.2d at 871 (citations and quotation marks omitted). Defendant asserts that there was insufficient evidence of distinct assaults to support his convictions for the two counts of assault with a deadly weapon inflicting serious injury and three counts of felony child abuse that did not address the injury to Joseph's privy member (one count of each was consolidated with the attempted castration charge for that injury).[4] We disagree.

The State here indicted defendant on multiple counts of assault and differentiated between the counts by injury. Defendant is correct that multiple injuries cannot sustain multiple counts of assault if they were inflicted as part of a single assault. *See State v. Dilldine*, 22 N.C.

---

4. Defendant bases his argument entirely on the sufficiency of the evidence and does not explicitly raise double jeopardy. Nevertheless, it is important to note that the felony child abuse statute specifically states that it "is an offense additional to other civil and criminal provisions and is not intended to repeal or preclude any other sanctions or remedies." N.C. Gen. Stat. § 14-318.4(b) (2007). Therefore, there is nothing that precludes punishment for both child abuse and assault with a deadly weapon inflicting serious injury if the evidence supports both charges. *See State v. Elliott*, 344 N.C. 242, 278, 475 S.E.2d 202, 219 (1996) (finding no error in punishing a defendant for both first degree murder and felony child abuse for the same conduct).

App. 229, 231, 206 S.E.2d 364, 366 (1974). If, however, there is evidence that each injury was sustained in a distinct assault, it is not error to convict and punish the defendant for multiple counts.

Most of defendant's argument concerns the particular nature of the injuries alleged. For instance, he argues that because the State indicted him for assault with a deadly weapon inflicting serious injury, "to wit: blunt force trauma to the abdomen," the State was required to prove a separate assault in which blunt force trauma to the abdomen was actually suffered.

Although defendant does not directly argue that there was a fatal variance between the indictment and the proof, he contends that the State had to prove the type of injury to the part of Joseph's body specified in the indictment. Therefore, that analysis is instructive in considering whether there was sufficient evidence to support separate counts.

> An indictment must set forth each of the essential elements of the offense. Allegations beyond the essential elements of the offense are irrelevant and may be treated as surplusage and disregarded when testing the sufficiency of the indictment. To require dismissal any variance must be material and substantial and involve an essential element.

*State v. Pelham,* 164 N.C. App. 70, 79, 595 S.E.2d 197, 203 (2004) (citations omitted).

Serious injury is an essential element of assault with a deadly weapon inflicting serious injury under N.C. Gen. Stat. § 14-32(b) and serious physical injury is an essential element of felony child abuse under N.C. Gen. Stat. § 14-318.4(a). *State v. Anderson,* ___ N.C. App. ___, ___, 730 S.E.2d 262, 266 (2012); *State v. Qualls,* 130 N.C. App. 1, 7, 502 S.E.2d 31, 35 (1998). The location of the injury, however, is not an essential element of either crime. We have held that a trial court properly refused to dismiss a felony child abuse charge where the indictment alleged that the assault caused a subdural hematoma when in fact it caused an *epidural* hematoma because that information was not an essential element of the crime. *Qualls,* 130 N.C. App. at 8, 502 S.E.2d at 36. Just as the level of skin on which the injury was inflicted is not an essential element, the precise location of the injury on the body is also not an essential element of felony child abuse. *See id.*

The same analysis holds true for assault with a deadly weapon inflicting serious injury. Nothing requires the State to allege the body

.

part to which serious injury was inflicted and certainly not with the specificity that defendant's argument would require. *See* N.C. Gen. Stat. § 14-32(b) (2007). Language in the indictment indicating to which body part serious injury or serious bodily injury was inflicted is "irrelevant and may be treated as surplusage." *Pelham*, 164 N.C. App. at 79, 595 S.E.2d at 203.

As a result, the question is not whether the State failed to prove different assaults resulting in blunt force trauma to the head, blunt force trauma to the abdomen, and bruises about the body, but whether the State proved at least three distinct assaults in addition to the assault on Joseph's privy member.

During trial, Joseph described the following assaults:

[Prosecutor]: Were—did Todd ever hit you in your nose?

[Joseph]: He made me bleed from doing that.

THE COURT: I'm sorry?

[Joseph]: He made me bleed.

[Prosecutor]: Could you tell the jury about how that happened?

[Joseph]: He was hitting me like that (indicating).

. . . .

[Prosecutor] And when you say "bleed," would you be able to tell the jury how much blood or—

[Joseph]: That one time, that was a lot of blood.

[Prosecutor]: Do you remember when that one time was? Was it closer to when he moved in, or was it closer to when you didn't see him anymore?

[Joseph]: It was closer to when I didn't see him anymore.

[Prosecutor]: And, [Joseph], did there—was there a time when Todd began to hit you more?

[Joseph]: Before I went to the hospital.

. . . .

[Prosecutor]: [Joseph], did there come a time when you stayed home from school?

[Joseph]:  Yes.

[Prosecutor]:  Could you tell the ladies and gentlemen of the jury—and don't forget to speak up—how that came about?

[Joseph]  When I started getting the bruises on my face.

[Prosecutor]:  And how did you get those bruises on your face?

[Joseph]:  Him punching me.

[Prosecutor]:  When you say "him," who are you talking about?

[Joseph]:  Todd.

. . . .

[Prosecutor]:  During the time that you were home, did Todd kick you?

[Joseph]:  On the sides.

[Prosecutor]:  Could you tell them how?

[Joseph]:  He would just kick me in the sides.

[Prosecutor]:  Do you know how often?

[Joseph]:  (No answer.)

THE COURT:  When you say "how often," are you asking how many times or on how many occasions?

[Prosecutor]:  Do you remember how many times?

[Joseph]:  No.

[Prosecutor]:  How did it feel?

[Joseph]:  Bad.

[Prosecutor]:  What happened to your body as a result of him kicking you like that?

[Joseph]:  Had a big bruise on the side.

[Prosecutor]:  Which side?

[Joseph]:  Left or right—I think left.

Additionally, Dr. Cooper described Joseph's injuries at the time of her initial examination:

> This child had numerous injuries of varying ages, but he had some specific injuries that are most concerning. He had a large bruise right next to his left nipple right over the left chest. It was a red bruise. It was relatively round. It was consistent with direct blunt force trauma injury. Because of its round nature, it was most consistent with perhaps a fist or some type of object in that manner. He also had black eyes. He had bleeding of the white of the eye on the left side. We call that a scleral hemorrhage. Scleral hemorrhages can occur from someone hitting you directly in the eye or from a strangulation injury where the blood vessels will start to pop in your eye and you can bleed on the white of the eye. He had evidence of bruises over the abdomen especially in the middle upper part of the abdomen above his belly button, and then he had a bruise that was below the belly button. Now, those were very concerning to me because the bruise below the belly button is right over the bladder, and if a person punches you hard enough over your bladder, you can cause a bladder rupture or a tear in the bladder. That can be a very serious injury. The bruise that was next to the left nipple could be a fatal injury because any time a person gets direct blunt force trauma right over the heart, which is exactly where this was located, a patient can have a heart arrhythmia, the beats can get messed up and the patient can have an arrhythmic heart condition that causes you to just completely drop dead. That has been well described in athletes who get something like a basketball or something or football that hits them in the chest. The other thing about this child is that he had multiple bruises up and down both arms, and he had bruises especially on his knees, especially the left knee. In fact, the left knee was a little bit swollen as compared to the right knee, and the bruises on his left knee were a little bit more resolved. . . . . On the buttocks, he had old pinpoint injuries that we could see but no injuries that would be typical for classic corporal punishment, no stripes that you might see for belt marks or things of

that nature, which is always important for us to document, but instead, more direct blunt force trauma injuries.

Dr. Cooper's testimony supports the inference of multiple assaults not because of the number of injuries, but because he described the injuries in different stages of healing—some old, some new.

As to the fourth felony child abuse charge, one not paired with an assault with a deadly weapon inflicting serious injury charge, Joseph described the following assault:

[Prosecutor]: And Todd told you you were grounded for a month?

[Joseph]: Yes.

[Prosecutor]: And did you say anything about wanting to be grounded?

[Joseph]: I told him I didn't want to be grounded anymore.

[Prosecutor]: And what did he do then?

[Joseph]: Hit me with a bamboo stick.

[Prosecutor]: And where did that take place?

[Joseph]: Outside.

[Prosecutor]: What type of bamboo stick was it?

[Joseph]: A tiki stick, bamboo.

[Prosecutor]: Is that like a tiki torch that you put in the backyard that has a candle in it?

[Joseph]: Yes.

[Prosecutor]: Do you remember which end of the tiki torch he used?

[Joseph]: The one where you put the candle at.

. . . .

[Prosecutor]: How did you know it was ten times?

[Joseph]: Because that's how much he said he was going to hit me with.

[Prosecutor]: So he told you before he did it that he was going to hit you ten times?

[Joseph]: Yes.

Our Supreme Court has previously stated that

> a child's uncertainty as to the time or particular day the offense charged was committed goes to the weight of the testimony rather than its admissibility, and nonsuit may not be allowed on the ground that the State's evidence fails to fix any definite time when the offense was committed where there is sufficient evidence that the defendant committed each essential act of the offense.

*State v. Effler*, 309 N.C. 742, 749, 309 S.E.2d 203, 207 (1983) (citation omitted). Although not perfectly clear from Joseph's testimony, in context of the overall narrative and in the light most favorable to the State, it would be reasonable to infer that these instances occurred separately from each other with distinct interruptions between them. Therefore, they could form the basis of separate assault counts. *See McCoy*, 174 N.C. App. at 115, 620 S.E.2d at 871. The fact that these assaults form part of chronic and continual abuse does not change that conclusion.

E. Conclusion

We hold that the trial court did not err in denying defendant's motion to dismiss because there was sufficient evidence of each element of every crime charged and evidence that defendant was the perpetrator.

III. Closed Circuit Television Testimony

[2] Defendant next argues that the trial court erred by granting the State's motion to allow Joseph to testify outside his presence via closed-circuit television ("CCTV"), thereby violating his rights under the State and Federal constitutions to confront his accuser, and that the evidence did not support the trial court's findings of fact under N.C. Gen. Stat. § 15A-1225.1 (2011) in deciding to allow Joseph to testify via CCTV.

The trial court allowed Joseph to testify in the presence of the jury and attorneys, but made defendant go to another room where he could watch the proceedings on closed circuit television. There was a phone in the room so that defendant could cause a signal to flash on the phone on defense counsel's table to indicate he wished to speak

with his attorney. Defendant's trial counsel had a full opportunity to cross-examine Joseph when he was on the stand. Defendant was able to observe the proceedings in real time.

Defendant's constitutional argument has already been decided by this Court in *State v. Jackson*, ___ N.C. App. ___, 717 S.E.2d 35 (2011), *disc. rev. denied*, ___ N.C. ___, 720 S.E.2d 681 (2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 164 (2012). In *Jackson*, we held that where "trial testimony was subjected to rigorous adversarial testing . . . effective confrontation was preserved, and the use of one-way CCTV to procure [the juvenile witness'] evidence did not offend the Constitution, despite the lack of face-to-face confrontation." *Jackson*, ___ N.C. App. at ___, 720 S.E.2d at 40. Defendant does not contend that his ability to confront his accuser was inhibited in any way other than the use of CCTV. *Jackson* is binding on this Court and we apply it here. *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). Therefore, as in *Jackson*, we hold that his rights under the Sixth Amendment's Confrontation Clause and the North Carolina Constitution were not violated.

Defendant also argues that the trial court's findings of fact underlying his decision to permit use of CCTV were not supported by the evidence. N.C. Gen. Stat. § 15-1225.1 permits a juvenile under the age of 16 to testify through CCTV when the trial court finds: "(1) That the child witness would suffer serious emotional distress, not by the open forum in general, but by testifying in the defendant's presence, and (2) That the child's ability to communicate with the trier of fact would be impaired." N.C. Gen. Stat. § 15-1225.1 (2011).

Here, the trial court made the following findings of fact and conclusions of law:

> The child victim has suffered severe and continuing psychological harm from the abuse alleged to have been caused by the defendant;
>
> Two, the child's emotional distress is more than de minimis;
>
> Three, the child exhibits intense fear of the defendant;
>
> Four, the child is more likely to effectively communicate without the defendant's physical presence;
>
> Five, the significant progress made by the child would be jeopardized by having to testify in the defendant's presence;

Six, the child would be traumatized by the defendant's presence;

Seven, that trauma would impair the child's ability to communicate;

Eight, technology exists to provide two-way closed-circuit video testimony of the child providing full opportunity for contemporaneous cross-examination of the child by the defendant's counsel, in view of the judge, the jury and the defendant.

In consideration of the foregoing, the Court makes the following conclusions of law:

One, the child is likely to suffer emotional and psychological harm from testifying in the defendant's presence;

Two, denial of physical, face-to-face confrontation is necessary to protect the well-being of the child;

Three, public policy requires protection of the child's physical, emotional and psychological help;

Four, denial of a physical, face-to-face confrontation is necessary to further the public policy interest of the State;

Five, the State's transcendent interest in the welfare of the victim is sufficient to outweigh the defendant's right to face his accuser under the unique facts of this case;

Six, procedures under which the child will be examined are sufficient to protect the rights of the defendant as limited by the State's interest in the child's welfare under the unique facts of this case.

Therefore, the motion is allowed.

There was only one witness who testified during the hearing held by the trial court on this issue: Janet Cheek, a licensed clinical social worker and psychotherapist with years of training and experience in providing therapy to young victims of trauma. Ms. Cheek had worked with Joseph after he was removed from his mother's home. The prosecutor asked Ms. Cheek, "What is your opinion with regard to Joseph's ability to effectively and accurately testify about what happened to him in the presence of Todd Lanford?" Ms. Cheek responded:

I think that all progress that he's made in therapy would be at risk of him losing ground in his therapeutic movement forward. I think that he is—has reported repeatedly that he is terrified of Todd Lanford. I think that he would be at risk of not being able to have fluid—the ability to be able to report in a fluid the—all of the details and events of—of the week in question and the chronic events of the abuse that he's reported prior to the week in question; and, I think that he would be at risk of decompensation both in the courtroom and also decompensation of any therapeutic progress that he's made as a young teenager, and also in the ability to be able to function in the family structure that he's established.

The prosecutor then asked, "Okay. Given that you indicated to him that he would be protected in the courtroom, what is your assessment of that allaying his fears of Todd?" Ms. Cheek answered,

He's still terrified. . . . . I think that he would not effectively be able to testify in a courtroom if he had to face Todd. I think that he wants to be able to—to say what he needs to say, but I don't think that he would effectively be able to testify if he has to see Todd and/or see his mother for the first time. He has not been able to see his mother for a long period of time. I think either—either circumstance would be devastating.

Ms. Cheek further elaborated on re-direct,

I believe that it would do him grave harm emotionally, and I don't—do not believe that he would be able to be as effective in front of the defendant as he would be behind either the judge's chambers or in—with closed circuit TV. I just do not believe that he would be able to provide as efficient and effective testimony.

Defendant argues that because Ms. Cheek opined only that there was a "risk" of decompensation or psychological harm, the evidence did not support the trial court's fifth and sixth findings that the juvenile would be traumatized and that his progress would be jeopardized by having to testify in defendant's presence. We note first that on re-direct examination Ms. Cheek did state outright that, in her opinion, testifying face-to-face with defendant "would do him grave harm emotionally." Her testimony was not required to conform to the lan-

guage of the statute in order to support a factual finding that does. "We must not put form over substance; we must not return to strict legalism and require magic words chanted in precise sequence to make an act right." *State v. Jernigan*, 118 N.C. App. 240, 245, 455 S.E.2d 163, 167 (1995). We hold that the above testimony supports the trial court's findings of fact and that those findings of fact, in turn, support the trial court's conclusions of law. We therefore find no error in the trial court's decision to grant the State's motion to permit Joseph to testify via CCTV.

## IV.  Conclusion

In summary, we find no error in the trial court's decisions to deny defendant's motion to dismiss all charges against him, and no error in the court's decision to permit the juvenile witness to testify against defendant via CCTV.

NO ERROR.

Judges McGEE and HUNTER, JR., Robert N. concur.