STATE OF NORTH CAROLINA v. THOMAS LAMONTE JACKSON

No. COA10-1135

(Filed 4 October 2011)

**1. Constitutional Law—right to confrontation—remote broadcast of child sex abuse victim's testimony**

The trial court did not violate defendant's right to confrontation in a multiple sexual offenses with a child case by admitting evidence through remote broadcast of the child victim's testimony. While the child was not physically facing defendant, defendant and the jury could see and hear the child on a television monitor without delay as she testified under oath. Defendant had a full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant were able to view the child's body and demeanor by video monitor as she testified. The requirements of § 15A-1225.1 were satisfied by the findings that the child would be traumatized if compelled to testify in front of defendant, that such was specifically due to defendant's presence, and that the child's ability to communicate before the trier of fact would thereby be impaired.

**2. Sentencing—presumptive range—no Blakely error**

Although defendant contended that the trial court committed a *Blakely* error in a multiple sexual offenses with a child case by allegedly sentencing defendant based on aggravating factors that had not been found by the jury, defendant could not obtain relief because he was sentenced within the presumptive range. Further, the court did not consider the improperly found aggravating factors in sentencing defendant.

Appeal by Defendant from judgments entered 14 April 2010 by Judge W. Erwin Spainhour in Stanly County Superior Court. Heard in the Court of Appeals 9 March 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General Celia Grasty Lata, for the State.*

*Michael E. Casterline, for Defendant.*

BEASLEY, Judge.

STATE v. JACKSON

[216 N.C. App. 238 (2011)]

Thomas Lamonte Jackson (Defendant) appeals from judgment entered on his several convictions of sex offenses committed against child victim, C.G.[1] For the following reasons, we find no prejudicial error.

Where Defendant's arguments as to the guilt phase of trial deal solely with the procedure by which C.G. testified, a brief summary of underlying facts suffices. The evidence showed that Defendant, known as "Blue," sexually abused four-year-old C.G. on 19 April 2008. C.G. told her mother that Blue had "put his privacy part in her mouth and told her to lick and suck," "pulled her pants down," and "mashed really hard" with his fingers; and the nurse practitioners who examined C.G. observed symptoms consistent with child sexual assault. C.G. began wetting the bed, having bad dreams, and displaying a fear of men. On 29 April 2008, C.G. saw child sexual abuse and forensic examiner Amy Yow at the Butterfly House Children's Advocacy Center, and their videotaped interview was reviewed by child psychologist Dr. Mark Everson, who met with C.G. in late 2009. Dr. Everson noted behavior consistent with child sex abuse and, while admitting some variation in C.G.'s statements, stressed the consistency, in light of C.G.'s age at the time of the assault, as to the core elements thereof.

C.G. gave her account of the incident at trial and did so by closed-circuit television (CCTV). Where the State had moved for remote testimony under N.C. Gen. Stat. § 15A-1225.1, C.G.'s mother and Dr. Everson testified at a pre-trial hearing on 6 April 2010. The State urged the trial court to authorize the procedure so C.G. could be an effective witness. Defendant argued insufficient evidence supported the requisite statutory findings, and he also objected on the grounds of *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). Based primarily on Dr. Everson's testimony that C.G. would experience trauma by testifying in Defendant's presence, which would affect her ability to communicate with the jury, the trial court authorized the remote testimony and then found six-year-old C.G. competent to testify. Accordingly, C.G. testified by CCTV on the second day of trial that Blue had taken her into a bathroom, where he "put his priva[te] part in [her] mouth" while wiggling his body and "put his finger in [her] private part."

The jury found Defendant guilty of first degree sex offense with a child, crime against nature, and indecent liberties. The court consoli-

---

1. This pseudonym is used to protect the minor victim's identity and privacy.

dated the convictions and imposed a presumptive-range prison sentence of 384 to 470 months. On appeal, Defendant challenges the trial court's decision allowing C.G. to testify by CCTV. He also alleges that aggravating factors not found by the jury were improperly considered at sentencing.

## I. Remote Testimony

[1] A child witness, a minor under 16 at the time of testimony, may testify outside the defendant's physical presence in a criminal proceeding, but only if certain conditions are met. *See* N.C. Gen. Stat. § 15A-1225.1(a)(1), (3) (2009). Upon a motion for remote testimony, the trial court must "hold an evidentiary hearing," and can permit a child to testify "other than in an open forum" only if it first finds that, otherwise, (1) "the child witness would suffer serious emotional distress, not by the open forum in general, but by testifying in the defendant's presence, and (2) "the child's ability to communicate with the trier of fact would be impaired." N.C. Gen. Stat. § 15A-1225.1(b)-(c) (2009).

After hearing the State's motion, the trial court found that the evidence supported the requisite findings, allowed C.G. to testify by one-way CCTV, and explained that a television camera would be set up in a room next to the judge's chambers. The prosecutor, defense counsel, and C.G.'s mother, who had to keep silent, were allowed in the room with C.G. Defendant would remain in the courtroom, but a telephone system would enable him to speak privately with his attorney during C.G.'s testimony. C.G.'s image would be projected onto screens facing Defendant, the court, and the jury, who would be able to hear and see C.G. but would not be visible to anyone in the room with her. The trial court underscored that this method was intended to allow those in the courtroom to observe C.G.'s demeanor as she testified "in a similar manner as if [she] were in the open forum."[2]

Defendant claims the admission of evidence through remote broadcast violated the Confrontation Clause of the Sixth Amendment. Acknowledging the United States Supreme Court's *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666 (1990), decision that the Confrontation Clause does not categorically prohibit the use of one-way CCTV to procure a child sex offense victim's testimony, he

2. This meets the statute's conditions that the judge, jury, and defendant must be able to observe the child's demeanor as she testifies in a manner similar to the open forum and that the method elected must ensure that defense counsel "is physically present where the child testifies," has a full and fair opportunity to cross-examine the child, and can communicate privately with the defendant during the remote testimony. N.C. Gen. Stat. § 15A-1225.1(e).

argues that *Crawford* so unraveled *Craig's* reasoning that "*Craig* can no longer be seen as good law."[3] Alternatively, he contends that the evidence did not support the statutory findings. We hold the CCTV testimony did not violate Defendant's confrontation rights and that sufficient evidence existed to permit C.G. to testify outside his physical presence.

### A. *Confrontation Clause Issue*

We review *de novo* whether the right to confrontation was violated. *State v. Hurt*, ___ N.C. App. ___, ___, 702 S.E.2d 82, 87 (2010). The Confrontation Clause, applied to the states by the Fourteenth Amendment, protects the fundamental right of an accused "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Pointer v. Texas*, 380 U.S. 400, 403, 13 L. Ed. 2d 923 (1965). It aims to ensure the evidence is reliable "by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845, 111 L. Ed. 2d at ___. The elements of confrontation include the witness's: physical presence; under-oath testimony; cross-examination; and exposure of his demeanor to the jury. *Id.* at 845–46, 111 L. Ed. 2d at ___. The physical presence, or "face-to-face," requirement embodies the general Confrontation Clause protection of an accused's "right [to] physically face those who testify against him." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 94 L. Ed. 2d 40, ___ (1987). But, this general rule "must occasionally give way to considerations of public policy and the necessities of the case." *Mattox v. United States*, 156 U.S. 237, 243, 39 L. Ed. 409, 411 (1895). One policy area that often arises in the constitutional context is the protection of youth by using witness "shielding" procedures to balance the need for child sex crime victims' testimony against the risk of engendering further emotional distress. *See Coy v. Iowa*, 487 U.S. 1012, 1023, 101 L. Ed. 2d 857, 868 (1988) (O'Connor, J., concurring) (noting child abuse prosecutions are difficult, as the victim may be the only witness, and observing the various "ameliorative measures" taken by states to shield the child from added trauma occasioned by the courtroom atmosphere). The Supreme Court has deemed the interest in safeguarding child abuse victims from further trauma and embarrassment to be a compelling one that, depending on the necessities of the case, may outweigh a defendant's right to face his accusers in court. *See Craig*, 497 U.S. at 852–53, 111 L. Ed. 2d at 683.

---

3. While Defendant does not craft his argument as an attack on the legality of N.C. Gen. Stat. § 15A-1225.1, we note that the constitutionality of the recently enacted statute has not been challenged or ruled upon. *See* 2009 N.C. Sess. Laws ch. 356, § 2 (making § 15A-1225.1 effective 1 December 2009).

STATE v. JACKSON

[216 N.C. App. 238 (2011)]

When the Supreme Court first examined witness shielding in this context, however, it held the child victims' testimony from behind an opaque screen violated the Confrontation Clause. *See Coy,* 487 U.S. 1012, 101 L. Ed. 2d 857. But, two years later in *Craig,* the Court was faced with the same policy issue and held the face-to-face element of confrontation was outweighed by necessity, emphasizing significant differences from *Coy.* First, *Craig* involved the use of one-way CCTV, which allowed the child sex offense victims to testify without seeing anyone in the courtroom but permitted the accused to see them on a video monitor. *Craig,* 497 U.S. 836, 111 L. Ed. 2d 666. While denying literal face-to-face confrontation, the method preserved all other elements of confrontation—oath, cross-examination, and the jury's observation of the witness' demeanor—thus subjecting the testimony "to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851, 111 L. Ed. 2d at ___. The trial court in *Craig* also made individualized findings that the child witnesses needed special protection, *id.* at 845, 111 L. Ed. 2d at 678, where *Coy* contained no case-specific findings of necessity, *see Coy,* 487 U.S. 1021, 101 L. Ed. 2d 857 (leaving "for another day" whether there are any exceptions to the Confrontation Clause's "irreducible literal meaning"—namely, an accused's right "to meet face to face" those who give evidence at trial).

*Craig* elaborated that a finding of necessity is proper only if a trial court likewise finds, upon an evidentiary hearing, that: (1) the "procedure is necessary to protect the welfare of the particular child witness who seeks to testify"; (2) "the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and (3) "the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis.*" *Id.* at 855–56, 111 L. Ed. 2d at ___. Where a case-specific finding of necessity is thus made, the Confrontation Clause does not bar a court's use of one-way CCTV to receive testimony from a child witness in a child abuse case. *Id.* at 860, 111 L. Ed. 2d at ___. Defendant does not contend that the individualized findings set out in N.C. Gen. Stat. § 15A-1225.1(b) fail to satisfy *Craig's* requirements. Nor does he dispute that the trial court held a hearing, made the statutory findings, and found C.G. competent to testify. Rather, Defendant argues that *Craig's* authorization of the CCTV procedure cannot survive *Crawford v. Washington,* and he urges us to disregard the Court's earlier ruling.

STATE v. JACKSON

[216 N.C. App. 238 (2011)]

Defendant contends this partial rejection of *Roberts,* upon which *Craig* partially relied, so "destroy[ed] the linchpin" of *Craig* that it is no longer good precedent.

While we have not addressed this issue,[4] we observe an enduring reliance on *Craig* in other jurisdictions. *See State v. Blanchette,* 134 P.3d 19, 29 (Kan. Ct. App. 2006) (citing post-*Crawford* decisions holding CCTV testimony constitutional against Confrontation Clause challenges). In fact, many courts have examined the exact argument advanced here and have explicitly upheld *Craig* as governing whether a child victim's CCTV testimony violates the Confrontation Clause. *See, e.g., Horn v. Quarterman,* 508 F.3d 306, 318-19 (5th Cir. 2007); *State v. Arroyo,* 935 A.2d 975, 992 n.18 (Conn. 2007); *Blanchette,* 35 134 P.3d at 29; *State v. Griffin,* 202 S.W.3d 670, 680-81 (Mo. Ct. App. 2006); *State v. Henriod,* 131 P.3d 232, 237-38 (Utah 2006); *State v. Vogelsberg,* 724 N.W.2d 649, 651-55 (Wis. 2006). Moreover, we have found no case which holds *Craig* and *Crawford* cannot co-exist. *See State v. Stock,* 256 P.3d 899 (2011) (finding no court that has "concluded *Crawford* overruled *Craig.*"); *Roadcap v. Commonwealth,* 50 V. App. 732, 743, 653 S.E.2d 620, 625 (2007) ("As nearly all courts and commentators have agreed, *Crawford* did not overrule *Craig.*"). For the reasons detailed below, we join the weight of authority.

Admittedly, *Craig's* rationale seems inconsistent with some language in *Crawford. Compare Craig,* 497 U.S. at 853, 111 L. Ed. 2d at ___ (concluding the right to physically face witnesses may be outweighed by child abuse victim's well-being), *and id.* at 848, 111 L. Ed. 2d at 682 (citing *Roberts* for propositions that: (i) "a literal reading of the Confrontation Clause would 'abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme' "; and (ii) the face-to-face element may be denied if "necessary to further an important public policy and only where the reliability of the testimony is otherwise assured"), *with Crawford,* 541 U.S. at 54, 158 L. Ed. 2d at ___ ("The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts."). Defendant contends that *Crawford's* language imposes a face-to-face requirement for all testimonial hearsay

---

4. This Court has affirmed the use of one-way CCTV testimony by a child sexual abuse victim only one time and did so in a pre-*Crawford* decision. *See In re Stradford,* 119 N.C. App. 654, 657-58, 460 S.E.2d 173, 175 (1995) (holding child witness's testimony did not violate defendant's confrontation rights and trial court, albeit prior to statutory authorization of remote testimony, properly exercised discretion in allowing the method).

and is thus fatal to *Craig's* holding. But he does not recognize that the face-to-face aspect of confrontation at trial was not at issue in *Crawford*, or that the Court did not hold that such was required in every case. Where "*Crawford* and *Craig* address distinct confrontation questions," *Vogelsberg*, 724 N.W.2d at 654, we may not consider their language in a vacuum apart from the distinct contexts in which it appears.

Defendant's argument regarding C.G.'s testimony by CCTV is thus controlled by *Craig*, not *Crawford*, and we tailor our analysis accordingly.

While C.G. was not physically facing Defendant, he (and the jury) could see and hear her on a television monitor without delay as she testified under oath. Defendant could thereby evaluate her demeanor and perceive the inflections in her voice. He was also able to communicate directly with his lawyer and express any concerns about transmission, volume, perception, or visibility. In fact, when C.G. was not properly positioned so as to be seen by Defendant and the jury, the trial court adequately addressed it. Furthermore, Defendant was able to fully cross-examine C.G. This procedure left all other elements of confrontation intact: C.G. was found competent to testify under oath; Defendant had a full opportunity for contemporaneous cross-examination; and the judge, jury, and Defendant were able to view C.G.'s body and demeanor by video monitor as she testified. *See Craig*, 497 U.S. at 857, 111 L. Ed. 2d at ___ (approving of the CCTV method not only due to the necessity-based findings, but also where child witnesses testified under oath, were subject to full cross-examination, and were observable by the judge, jury, and defendant as they testified). As C.G.'s trial testimony was subjected to rigorous adversarial testing thereby, effective confrontation was preserved, and the use of one-way CCTV to procure her evidence did not offend the Constitution, despite the lack of face-to-face confrontation.

B. *Statutory Issue*

Defendant argues that even if the Sixth Amendment was not violated, N.C. Gen. Stat. § 15A-1225.1 was. Where C.G. was found competent to testify, § 15A-1225.1(b) permitted her to do so remotely if the trial court determined that testifying in Defendant's presence, not just the open forum generally, would cause her serious emotional distress and impair her ability to communicate with the trier of fact. The trial court heard case-specific evidence as to whether closed-circuit testimony was necessary and found "that the child witness, [C.G.],

would suffer serious emotional distress, based upon the evidence presented to the court today, by testifying in the defendant's presence and that the child's ability to communicate with the—with the jury, the trier of fact, would be impaired."

Defendant challenges the court's authorization of the CCTV procedure on the ground that the evidence did not support the findings. As the standard of review on a trial court's § 15A-1225.1 ruling is not statutorily defined and we have yet to address the statute, our scope of review has not been developed. *But see Stradford*, 119 N.C. App. at 659, 460 S.E.2d at 176 (pre-statute decision reviewing trial court's finding that "children would be traumatized by defendant" for "proper evidentiary support" and holding the testimony "provided adequate support" for decision to authorize use of remote testimony). Defendant suggests, however, and we agree, that a trial court's decision that remote testimony is necessary and its underlying § 15A-1225.1(b) determinations are findings of fact that will not be disturbed on appeal absent competent record evidence in support thereof. Accordingly, we must decide if the hearing testimony, viewed in favor of the moving party, presents any competent evidence in support of the court's particularized findings.

C.G.'s mother testified to the many behavioral changes C.G. exhibited after reporting the incident. In addition to bed wetting, bad dreams, and guardedness around men, C.G. expressed anxiety over the prospect of encountering Blue again. C.G. had inquired several times as to Blue's whereabouts and, after being told that Defendant "was locked up," remained concerned over whether he would "stay there forever." When C.G.'s mother said yes, C.G. appeared "at ease" or at least not "as scared." Dr. Everson, received as an expert "in child psychology and particularly in regard to child trauma or maltreatment," then testified on the basis of his interview with C.G., his review of C.G.'s videotaped forensic interview with Ms. Yow, and C.G.'s mother's reflections. He detailed his late 2009 assessment of C.G., over one and a half years after the alleged incident with Blue, and found that she displayed "behavior symptoms that are often related to stress or traumatic reactions."

Dr. Everson also opined that C.G. would not be capable of effectively testifying in front of Defendant and explained the bases for his expert opinion: first, C.G.'s initial attempt to disclose the traumatic incident she described was met with non-support, as her grandmother had told her not to "talk about that"; C.G. then became "spacy and preoccupied" and began exhibiting regressive behaviors; and the

result is "a kid who was psychologically traumatized at the time" but received no treatment for her trauma "except the passage of time." Dr. Everson further anticipated "that when C.G. is faced with events, people, whatever that remind her of the trauma, that she could very well re-experience it, given that she's not had treatment for it" and believed that a "secondary trauma" could be caused by "having C.G. testify in front of the defendant." He worried about C.G.'s re-experiencing the trauma "when she's around the defendant and certainly, along with that, a closing down in terms of being—as a witness." The "combination of the trauma, the re-experiencing, and the general avoidance [of talking about the trauma]" made it "pretty clear" to the expert that C.G. was "going to close down" and "not be a witness in terms of telling her experiences."

The trial court found that this testimony presented "clear and convincing evidence," that it should permit C.G. to testify "using the closed-circuit television apparatus" in order to "protect [her] from trauma that would be caused by testifying in the physical presence of the defendant where, in the opinion of the court, that such trauma would impair the child's ability to communicate." Defendant argues that any evidence of the emotionally traumatic impact that testifying in front of Defendant would have on C.G. was "vague and speculative" and that her expected ineffectiveness as a trial witness was not adequately linked to Defendant's presence. We disagree.

Initially, we note the Supreme Court's approval of a trial court's reliance on expert testimony in making the factual findings necessary to admit CCTV testimony. *See Craig*, 497 U.S. at 860, 111 L. Ed. 2d at 688 ("The trial court in this case, for example, could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence 'will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate.' " ). Viewed in its entirety, and in a light most favorable to the State as the moving party, Dr. Everson's expert testimony sufficiently links Defendant's presence to the emotional trauma that C.G. would suffer if she were forced to testify in the courtroom. This finding is further supported by C.G.'s mother's testimony that C.G. was preoccupied with Defendant's whereabouts and relieved to hear that he would stay in jail forever is significant. Moreover, Dr. Everson specifically connected his projection that C.G. would close down as a witness to her being "around [Defendant]."

We find no merit to Defendant's argument that Dr. Everson's expert emotional distress testimony was "vague and speculative." *See In re Stradford*, 119 N.C. App. at 659, 460 S.E.2d. at 176 (holding testimony of clinical therapist as to victim's further traumatization, based on training, experience and therapy sessions, provided "adequate support for the trial court's decision to authorize the use of remote testimony"). Where Dr. Everson provided a detailed account of his psychological assessment of C.G., it was reasonable for the trial court to believe that C.G. would be further traumatized, and not just anxious or upset, if she had to testify in Defendant's physical presence. Nor are we persuaded by Defendant's contention that the expert failed to identify whether C.G. "would suffer serious and long-lasting emotional consequences if she testified in front of the defendant, or if she'd just be upset for an hour or two." *See Craig*, 497 U.S. at 856-57, 111 L. Ed. 2d at 685-86 (declining to "decide the minimum showing of emotional trauma required for use of the special [CCTV] procedure" but noting that the level of trauma would meet constitutional standards if it "would impair the child's ability to communicate"). In fact, Defendant admits that Dr. Everson "opined that [C.G.] might close down and not be able to share her experiences, if she were asked to testify in front of the defendant."

We thus conclude that the evidence sufficiently supports the trial court's findings that C.G. would be traumatized if compelled to testify in front of Defendant; that such was specifically due to Defendant's presence; and that C.G.'s ability to communicate before the trier of fact would thereby be impaired. The trial court's findings further satisfied the requirements set forth by N.C. Gen. Stat. § 15A-1225.1, and C.G.'s testimony by CCTV was properly allowed.

## II. Sentencing

[2] While Defendant challenges his sentence as improperly based on aggravating factors that had not been found by the jury in violation of *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004), he was sentenced in the presumptive range. It is true that "a new sentencing hearing must be granted when a judge *aggravates* a criminal sentence on the basis of findings made by the judge that are in addition to or in lieu of findings made by a jury," as "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *State v. Shaw*, ___ N.C. App. ___, ___, 700 S.E.2d 62, 63-64 (2010) (emphasis added) (internal quotation marks and citations omitted); *see also Blakely*, 542 U.S. at 303, 159 L. Ed. 2d at 413 (defining "statutory max-

imum" as the maximum sentence that can be imposed "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant"). Although the trial court stated on the record that he had found certain aggravating factors—despite none being offered by the State or found by the jury—it did not impose a sentence outside the statutory maximum. Thus, Defendant cannot obtain relief from the rule that "[w]hen the trial judge errs in finding an aggravating factor and imposes a sentence in excess of the presumptive term, the case must be remanded for a new sentencing hearing." *State v. Wilson*, 338 N.C. 244, 259, 449 S.E.2d 391, 400 (1994) (emphasis added).

Defendant also cites *State v. Boone*, 293 N.C. 702, 712, 239 S.E.2d 459, 465 (1977), for its holding that the presumption that a sentence within the statutory limit is valid may be overcome "[i]f the record discloses that the court considered irrelevant and improper matter in determining the severity of the sentence." The record, however, reveals that the court did *not* consider the improperly found aggravating factors in sentencing Defendant. The trial judge recognized his mistake and, the day after judgment was entered, ordered *sua sponte* that a re-sentencing hearing be held to correct his "error in stating on the record that aggravating factors would be found after the jury had not been requested to consider aggravating factors." Not only did the order indicate "that notwithstanding the foregoing findings the court did sentence the defendant within the presumptive range," but the trial judge also emphasized at the 20 April 2010 hearing on the court's own motion for appropriate relief that his erroneously found aggravating factors during sentencing "played no role in the sentence announced." Because the trial court had also found mitigating factors, the judge made sure to clarify the record, noting "that at that time, and again now, the court reaffirms that the mitigating factors do not justify and are insufficient to justify a departure from the presumptive range of sentencing." The trial court then reviewed the findings in mitigation, reiterated that a downward departure was not warranted, and reaffirmed the sentence imposed, specifying: "I'm not changing one thing about the time of the length of the sentence that was in the presumptive range. I merely wanted to make it clear as to what had happened." It is thus clear that the improper consideration of aggravating factors had no impact on Defendant's sentence, and we overrule this argument.

No prejudicial error.

Judges CALABRIA and STEELMAN concur.