ELMORE, Judge.
 

 *849
 
 Noui Phachoumphone (defendant) appeals from a judgment entered after a jury convicted him of first-degree sex offense with a child and of taking indecent liberties with a child. The State's evidence tended to show that, during the evening of 19 August 2014, defendant's sister, Sara, entered defendant's girlfriend's apartment and saw defendant engaging in sexual activities with his girlfriend's six-year-old daughter, Tara.
 
 [1]
 

 On appeal, defendant contends the trial court violated N.C. Gen. Stat. § 15A-1225.1's procedural requirements by authorizing Tara's testimony to be taken remotely without holding a recorded evidentiary hearing on the matter or entering an order supporting its decision to allow the State's motion. Defendant also contends the trial court erred by denying his motions to dismiss both charges for insufficient evidence, and by failing to intervene
 
 ex mero motu
 
 when the prosecutor argued to the jury that certain out-of-court statements established substantive evidence of defendant's guilt. We hold that defendant received a fair trial, free of prejudicial error.
 

 I. Background
 

 Prior to August 2014, six-year-old Tara lived in apartment 36 at Chesterfield Apartments in Kings Mountain with her mother and her mother's boyfriend, defendant, who was forty years old. Defendant's sister, Sara, also lived in a nearby apartment at Chesterfield Apartments.
 

 During the evening of 19 August 2014, Sara was outside smoking a cigarette when
 
 *750
 
 she noticed defendant, also outside, drinking and "pretty
 
 *850
 
 intoxicated." A few minutes after Sara saw defendant go into apartment 36, she saw Tara walking outside by herself and then enter the apartment. Sara believed Tara was supposed to be staying with her babysitter at a nearby apartment in Chesterfield Apartments, so she went to investigate. After Sara's knocks on the door to apartment 36 went unanswered, she entered the apartment and saw defendant and Tara lying together in a bed on the living room floor. Exactly what Sara observed is disputed. According to Sara's statements to police immediately after the incident, she saw defendant lying on top of Tara while both were naked, and saw defendant masturbating while rubbing Tara's vagina; however, according to her trial testimony, she merely observed defendant with his pants on but no shirt, Tara's dress halfway off and somewhat up, and defendant with his hands around her. Whatever Sara saw when she entered the apartment, it caused her to became extremely upset, she tried to remove Tara from the apartment, and she got into a heated argument with defendant when he refused to let her take Tara. Sara then called 911.
 

 Sergeant Doug Shockley of the Kings Mountain Police Department responded to the call at Chesterfield Apartments, where a 6-year-old girl was reportedly being held against her will. When he arrived, he met Sara, who was "crying hysterically" and appeared "very nervous and upset." Sgt. Shockley met defendant at the door. Defendant reported that he and Sara did not get along, and she was just trying to cause him trouble. Defendant stated that Tara became frightened that night and came downstairs to sleep beside him on the couch. Sgt. Shockley instructed defendant to wait outside as he spoke with Tara.
 

 When Sgt. Shockley entered the apartment to speak with Tara, he saw her sitting on the couch, clutching a pillow, and "crying hysterically, shaking." According to Sgt. Shockley, Tara immediately stated: " 'I don't know why he did this to me.' " Tara clarified: " '[Defendant], I don't know why he was laying on top of me. He was rubbing me down there' " and then Tara "pointed toward ... her genital area." Sgt. Shockley then contacted Detective Sergeant Lisa Proctor, who instructed that Sara, Tara, and defendant be taken into the police station for questioning.
 

 During Sara's police interview, she reported that when she entered the apartment, defendant was "totally naked" and masturbating while playing with Tara. During Tara's interview, she reported that defendant "was naked," "had gotten on top of her," "taken her clothes off," and "touched her in her cootie with his hands."
 

 The next day, Tara was examined by Dr. Christopher Cerjan, a pediatrician at Shelby Children's Clinic. During the exam, Tara reported to
 
 *851
 
 Dr. Cerjan that defendant "took [her clothes] off," "touched her with ... his hands," and "pointed to her groin." Dr. Cerjan discovered that Tara had very little hymen tissue, which he opined was abnormal for a six-year-old and that a penetrating injury was the only possible cause. He also found redness inside Tara's vaginal area, indicating that the penetration likely occurred within the preceding forty-eight hours.
 

 Near the end of the first day of trial, the State called Tara to testify. Because she was unresponsive, the court decided to excuse the jury for the evening and start fresh the next day. On day two, the State directly examined Tara for nearly two-and-a-half hours but was unable to elicit any helpful testimony about the incident. Tara demonstrated that she understood the difference between a truth or a lie, but either did not respond at all or merely shook her head "yes" or "no" to several questions. Tara was unwilling to say defendant's name but did indicate that something happened between her and defendant, that it happened to her body, and appeared to indicate by confirming when the State pointed to this location on a bear used for demonstrative purposes, that it happened between her legs. Tara confirmed that "this [was] the right spot on [her] body where [she was] hurt." However, Tara was largely unresponsive when asked to provide any further details. The State then called Sara to testify.
 

 Sara's trial testimony differed from her prior statements to police. Sara testified that when she entered the apartment, she saw defendant "laying on ... the bed on the floor
 
 *751
 
 in the living room, and [Tara] next to him." "What [she] ... clearly it didn't look appropriate. So immediately [she] told [Tara] to get up and come with [her]." She testified that defendant "had his pants on but he was shirtless," and Sara only "saw [Tara]'s dress halfway off and somewhat up. And [defendant] ... had his hands around her but that, that was it." She explained: "I mean ... from that moment, I just reacted and I called out [Tara's] name to come with me. And when [defendant] heard, they just stood up and that's when the ... argument started." When pressed by the State during direct, Sara stated that at the time she gave her recorded police interview, she was "drunk," "upset," "mad," and "wasn't thinking clearly. ..." Sara further stated that "it was dark," she "didn't see anything" but "jumped to conclusion [sic]," and "might have exaggerated" during the police interview. Sara admitted that in her prior recorded statement, she told police that she saw defendant "totally naked with his private part out and [masturbating] while he was playing with [Tara]," but stated at trial that she "said it out of anger," "exaggerated it a little bit," and "that's not what happened."
 
 *852
 
 At the start of the third day of trial, the State filed a motion under N.C. Gen. Stat. § 15A-1225.1 to allow Tara's testimony to be taken remotely, arguing that Tara "would suffer and has suffered serious emotional distress by testifying in front of the defendant" and that "this emotional distress has made it difficult for [Tara] to speak, and [Tara]'s ability to communicate with the trier of fact is impaired and thus interferes with the ability of jurors to ascertain the truth." Defense counsel objected on the ground that the motion was untimely filed, and the State never presented an expert to support the motion. After considering the parties' arguments, and its own observation of Tara's prior in-court testimony, the trial court allowed the motion, authorizing Tara's testimony to be taken remotely.
 

 During Tara's remote testimony, she demonstrated what defendant had done to her by inserting her finger through a hole an interpreter had created with her hands. She explained that "it hurt," that no one else had ever touched her that way, and that defendant had undressed her before committing the act.
 

 After the State's presentation of evidence, defense counsel called defendant's brother and defendant to testify. Defendant's brother stated that defendant and Tara had a great relationship, that defendant was "like a father figure to [Tara]," and that defendant was largely responsible for Tara's care when her mother was at work. Defendant's testimony corroborated these remarks from his brother. According to defendant, during the night of the incident, he was watching television and relaxing, drinking a beer, while wearing shorts and a t-shirt. Tara was on the bed, had fallen asleep in shorts and a t-shirt, and he had just covered her with a blanket when Sara came into the apartment. Sara immediately stated " 'I know you been [sic] drinking. I'm taking [Tara].' " According to defendant, when he refused to give up Tara, Sara warned " 'I'm going to call the cops and tell them you messing [sic] with her.' " Defendant testified that he never did anything inappropriate with Tara.
 

 At the conclusion of the evidence, defendant unsuccessfully moved to dismiss both charges for insufficiency of the evidence. The jury found defendant guilty as charged. The trial court imposed a prison sentence of 300 to 428 months for the first-degree sex offense with a child count, and a concurrent sentence of 21 to 35 months for the indecent liberties count. The trial court also ordered defendant to register as a sex offender for a period of thirty years, to enroll in lifetime satellite-based monitoring, and to have no contact with Tara for the remainder of his natural life. Defendant appeals.
 

 *853
 

 II. Alleged Errors
 

 On appeal, defendant contends the trial court erred by (1) failing to follow N.C. Gen. Stat. § 15A-1225.1 's procedural requirements in authorizing Tara's testimony to be taken remotely, denying his motions to dismiss (2) the first-degree sex offense with a child charge and (3) the indecent liberties charge, and (4) failing to intervene
 
 ex mero motu
 
 when the State argued to the jury that Sara's and Tara's out-of-court statements were substantive evidence of his guilt.
 

 *752
 

 III. Motion for Remote Testimony
 

 Defendant first contends the trial court violated N.C. Gen. Stat. § 15A-1225.1's procedural requirements by failing to (1) "hold a recorded evidentiary hearing," (2) "issue an order," and (3) "include in said order the five requirements set forth in section (d) of the statute." Defendant does not challenge the trial court's ultimate ruling permitting Tara to testify remotely under N.C. Gen. Stat. § 15A-1225.1 ; rather, he challenges the procedure employed in authorizing her remote testimony. We agree that the trial court erred by failing to follow statutory procedure, but overrule defendant's challenges on the ground that he has failed to demonstrate how any of these alleged procedural errors prejudiced him.
 

 A. Review Standard
 

 We review alleged statutory errors
 
 de novo
 
 .
 
 State v. Mackey
 
 ,
 
 209 N.C. App. 116
 
 , 120,
 
 708 S.E.2d 719
 
 , 721 (2011). Yet "a new trial does not necessarily follow a violation of statutory mandate."
 
 State v. Love
 
 ,
 
 177 N.C. App. 614
 
 , 623,
 
 630 S.E.2d 234
 
 , 240-41 (2006) (citation omitted). A defendant "must show not only that a statutory violation occurred, but also that [he or she was] prejudiced by this violation."
 

 Id.
 

 (citation omitted);
 
 see also
 

 State v. Braxton
 
 ,
 
 352 N.C. 158
 
 , 178,
 
 531 S.E.2d 428
 
 , 439 (2000) ("[E]ven if it be assumed
 
 arguendo
 
 that the jury selection procedure violated the randomness requirement of N.C.G.S. § 15A-1214(a), defendant has not demonstrated on appeal how he was prejudiced
 
 by the procedure
 
 ." (emphasis added));
 
 State v. Nobles
 
 ,
 
 350 N.C. 483
 
 , 506,
 
 515 S.E.2d 885
 
 , 899 (1999) (holding the trial court erred by failing to follow a statutory mandate but refusing to award a new trial where the "defendant has not met his burden of showing prejudice as a result of the trial court's failure to follow the requirements of N.C.G.S. § 15A-1233(a)").
 

 B. Discussion
 

 Under N.C. Gen. Stat. § 15A-1225.1 (2015), a trial court may authorize a child victim to testify remotely "when [it] determines: (1) That the child witness would suffer serious emotional distress, not by the open
 
 *854
 
 forum in general, but by testifying in the defendant's presence, and (2) That the child's ability to communicate with the trier of fact would be impaired."
 

 Id.
 

 § 15A-1225.1(b). Subsection (c) of the statute provides: "Upon motion of a party ... and for good cause shown, the [superior] court shall hold a[ recorded] evidentiary hearing to determine whether to allow remote testimony."
 

 Id.
 

 § 15A-1225.1(c) ;
 
 see also
 

 State v. Jackson
 
 ,
 
 216 N.C. App. 238
 
 , 240,
 
 717 S.E.2d 35
 
 , 37 (2011) ("Upon a motion for remote testimony, the trial court must 'hold an evidentiary hearing[.]' ..." (quoting N.C. Gen. Stat. § 15A-1225.1(c) (2009) )). Subsection (d) contemplates that a trial court enter an order "allowing or disallowing the use of remote testimony" that "shall state the findings of fact and conclusions of law that support the court's determination." N.C. Gen. Stat. § 15A-1225.1(d). Subsection (d) provides further that "[a]n order allowing the use of remote testimony shall do the following:
 

 (1) State the method by which the child is to testify.
 

 (2) List any individual or category of individuals allowed to be in, or required to be excluded from, the presence of the child during the testimony.
 

 (3) State any special conditions necessary to facilitate the cross-examination of the child.
 

 (4) State any condition or limitation upon the participation of individuals in the child's presence during his or her testimony.
 

 (5) State any other condition necessary for taking or presenting the testimony."
 

 Id.
 

 Both parties cite to two cases in which this Court addressed challenges to a trial court's N.C. Gen. Stat. § 15A-1225.1 authorization to take a child victim's testimony remotely.
 
 See
 

 State v. Lanford
 
 ,
 
 225 N.C. App. 189
 
 , 204-08,
 
 736 S.E.2d 619
 
 , 629-31 (2013) ;
 
 Jackson
 
 ,
 
 216 N.C. App. at 240-41, 244-47
 
 ,
 
 717 S.E.2d at 35-38, 40-42
 
 . But neither case provides guidance in assessing the procedure employed here. In both
 
 Lanford
 
 and
 
 Jackson
 
 , the State filed a pretrial motion for remote testimony, and the trial court held an evidentiary hearing
 
 *753
 
 before trial where it considered testimony from the State's witness(es) concerning whether the child would suffer serious emotional distress and be unable to communicate effectively to the jury.
 
 Lanford
 
 ,
 
 225 N.C. App. at 206-07
 
 ,
 
 736 S.E.2d at
 
 630-31 ;
 
 Jackson
 
 ,
 
 216 N.C. App. at 239
 
 ,
 
 717 S.E.2d at 37
 
 . Here, contrarily, the State filed its motion during trial, after unsuccessfully attempting
 
 *855
 
 to elicit Tara's testimony, and the State never presented any witnesses specifically to testify on whether Tara would suffer serious emotional distress or be unable to communicate effectively to the jury if she testified in defendant's presence. Additionally, the trial court here never entered an order on the motion.
 

 Based on our interpretation of the statutory language, we agree that the procedures employed violated N.C. Gen. Stat. § 15A-1225.1's express requirements. However, "a new trial does not automatically follow a finding of statutory error."
 
 State v. Garcia
 
 ,
 
 358 N.C. 382
 
 , 406,
 
 597 S.E.2d 724
 
 , 742-43 (2004). Defendant has failed to demonstrate how he was prejudiced by the particular procedure employed.
 
 See
 

 id.
 
 at 407-08,
 
 597 S.E.2d at 743
 
 (requiring a defendant "to show how the identified statutory violation [concerning the jury selection process] prejudiced his case"-that is, how "the aberrant procedure resulted in a biased jury, an inability to question the prospective jurors, an interference with his right to challenge, or any other defect without which a different result might have been reached.")
 

 Here, the State had previously called Tara to testify during its case-in-chief for nearly two-and-a-half hours, affording the trial court an opportunity to closely observe her behavior, demeanor, and the effectiveness of her communication while testifying in front of defendant, and providing competent evidence to support its motion. That presentation developed a "record very clear to the Court" that Tara had suffered serious distress by testifying in front of defendant and that her ability to communicate effectively with the jury was "very evident[ly]" impaired. According to the "[c]ourt's observations ... when [Tara] was in the courtroom for numerous hours, it was apparent," and the trial judge found, that Tara "was consistently frightened in her eyes"; that when the trial judge "looked into [Tara's] eyes, into her face[,]" she "just appeared to be scared"; that Tara "would very, very occasionally smile"; that Tara "articulated that she was, quote, scared herself" and "[h]er affect was consistent with that"; and that Tara "was hugging a bear ... and was leaning into the person that was holding her on her lap."
 

 Furthermore, the trial court held a lengthy conference on the State's motion, considered both parties' arguments, and explicitly allowed defendant to present evidence on the matter before rendering the required determinations that (1) Tara "would suffer serious emotional distress by continuing to be in the courtroom and in the defendant's presence[ ]" and that (2) "[c]learly [Tara]'s ability to communicate would continue to be impaired." During the conference on the motion, the prosecutor explained that she had met with Tara multiple times before
 
 *856
 
 trial, brought her into the courtroom so Tara could practice answering questions in court, and brought Tara to another court session so she would be familiar with a full courtroom setting. Therefore, the prosecutor explained, she "did not anticipate the level of terror and shutdown that we had when [Tara] testified," which the prosecutor emphasized "was readily apparent to the court." The prosecutor elaborated:
 

 [Tara], you know, on day one was sobbing and keening and would not state her name the minute she walked in this courtroom.
 

 Yesterday when [Tara] testified, she progressively turned her back away from the defendant. She would not say his name. [Tara] has expressed to her father, to my assistant, to her father's girl friend, to everybody, that she does not want to see [defendant]. And I think that reluctance was very obvious and really impacted [Tara's] ability to testify in front of the jury, which I think has impacted the jury's ability to know and understand the events of this day.
 

 [Tara] refuses to speak in English and said she wanted to speak in Spanish to the
 
 *754
 
 extent that she spoke at all, even though she understands and speaks English.
 

 Defendant does not dispute these statements on appeal, argue that good cause did not exist to authorize Tara's remote testimony, or challenge the trial court's substantive ruling in any respect.
 

 The trial court's repeated and indubitable findings and conclusions were supported by competent evidence in light of its own close observation of Tara's behavior and demeanor while testifying in front of defendant for multiple hours, the prosecutor's statements implying that Tara did not fear testifying in the open forum generally but in front of defendant particularly, and the bench conference on the matter. Defendant was afforded an opportunity to present evidence on the State's motion, and to the extent the procedure employed may have prohibited defendant from examining a State witness on the matter, defendant has failed to show how this alleged procedural error prejudiced him. The transcript indicates that Tara demonstrated a fear of defendant and was unable to communicate effectively while testifying in front of him, and the trial court determined that her prior in-court testimony established a "record ... very clear" that this was the case. Under these particular circumstances, defendant has failed to demonstrate prejudicial error in the hearing procedure employed by the trial court in authorizing the use
 
 *857
 
 of Tara's remote testimony.
 
 See
 

 Maryland v. Craig
 
 ,
 
 497 U.S. 836
 
 , 860,
 
 110 S.Ct. 3157
 
 ,
 
 111 L.Ed.2d 666
 
 (1990) ("[W]e decline to establish, as a matter of federal constitutional law, any ... categorical evidentiary prerequisites for the use of the one-way television procedure.").
 

 As to defendant's challenge concerning the trial court's failure to issue an order in allowing the State's motion, defendant similarly has failed to establish prejudice.
 

 In the context of authorizing a courtroom closure, this Court has stated that "[i]n making its [required] findings, the trial court's own observations can serve as the basis of a finding of fact as to facts which are readily ascertainable by the trial court's observations of its own courtroom."
 
 State v. Godley
 
 ,
 
 234 N.C. App. 562
 
 , 565,
 
 760 S.E.2d 285
 
 , 288 (citation, internal quotation marks, and brackets omitted),
 
 disc. rev. denied
 
 ,
 
 367 N.C. 792
 
 ,
 
 766 S.E.2d 626
 
 (2014) ;
 
 see
 

 id.
 
 at 566-68,
 
 760 S.E.2d at 289-90
 
 (upholding findings based on the trial court's "opportunity to observe the alleged victim" and the "attitude and demeanor of the victim and the defendant and the general nature and character of the audience" as supported by competent evidence based in part on the "trial court's own observations of the ... personnel inside the courtroom ...."). In this same context, this Court has found competent evidence existed to support a finding that "[t]here existed a particular fragile mental and emotional state of the victim due to the circumstances of the crime" based in large part on the trial court's observation of the victim.
 
 See
 

 State v. Rollins
 
 ,
 
 231 N.C. App. 451
 
 , 456-57,
 
 752 S.E.2d 230
 
 , 234-35 (2013). We explained:
 

 [T]his type of finding of fact is one that the trial court is particularly well-qualified to make, and one that we are not well-qualified to question. The trial judge had the opportunity to observe [the victim], defendant, and the other witnesses during the trial, including [the victim's] demeanor during the State's evidence up to the point of the State's motion. Observations of this sort are something that cannot be captured in a written transcript but are crucial in this particular determination.
 

 Id.
 

 We find this reasoning particularly instructive here.
 

 Based on the trial court's two-and-a-half hour observation of Tara's behavior and demeanor while testifying in front of defendant, it had sufficient competent evidence from which to issue its findings on the matter, and defendant does not specifically challenge the propriety of any of those findings; rather, he challenges the method by which the trial
 
 *858
 
 court rendered its findings and conclusions. The requirement that the trial court make written findings and conclusions serves to aid appellate review. While it would have been better practice for the trial court to reduce its oral findings to writing, we hold that those findings are adequate for appellate review, were supported by competent evidence, supported the conclusions, and justified the
 
 *755
 
 trial court's ultimate ruling. Accordingly, we overrule this challenge.
 

 As to defendant's challenge that the trial court failed to issue an order reflecting that it considered N.C. Gen. Stat. § 15A-1225.1(d)'s five enumerations, defendant similarly has failed to demonstrate prejudice.
 

 Defendant does not argue that the taking of Tara's remote testimony, from a logistical standpoint, prejudiced him in any respect.
 
 See
 

 Garcia
 
 ,
 
 358 N.C. at 407-08
 
 ,
 
 597 S.E.2d at 743
 
 ("[D]efendant ... has made no attempt ... to show how the identified statutory violation prejudiced his case. Defendant has not complained that the aberrant [jury selection] procedure resulted in a biased jury, an inability to question the prospective jurors, an interference with his right to challenge, or any other defect without which a different result might have been reached."). Moreover, the transcript reflects that the trial court thoughtfully considered N.C. Gen. Stat. § 15A-1225.1(d)'s enumerations.
 

 During the conference on the matter, the following relevant exchange occurred concerning the logistics of taking Tara's testimony remotely:
 

 [PROSECUTOR]: Mr. Sheppard is here from the [Administrative Office of the Courts] with the equipment, and he has set it up. It had to be somewhere close to the courtroom. So [Tara] will be in a closed room with, I would propose, my assistant and just sitting yesterday as she was in the courtroom, and we will be able to see them and the interpreter. And [Tara] cannot see us but she can hear us. And we can see her and everyone around her and every motion she makes. ... by remote testimony.
 

 [Tara] will be visible to the court on its monitor and to the courtroom on this monitor just by television. You will be able to see her sitting in that room. Mr. Sheppard's set up the camera in here and in there and the audio equipment. There's a microphone that whoever is questioning her will probably need to use to facilitate the best ability for her to hear us, and she will have a microphone available to her as well. So it will be just like [Tara]'s sitting here except she's in another room visible to us on the screen. You can see and hear everything she does and says.
 

 *859
 
 THE COURT: So you're talking about staying in the courtroom and questioning her from here?
 

 [PROSECUTOR]: Yes, the defendant and counsel staying ....
 

 ....
 

 THE COURT: Well, I mean, you certainly would have the option of not being present, but [defense counsel], if he wished to be present ..., by statute it says that he has to be given the opportunity to be physically present with the witness.
 

 ....
 

 THE COURT: So with respect to [defense counsel], if it's allowed, then he would have that option of being in [the courtroom] or being in the room with [Tara]. And then the statute talks about making sure there's contact or ability to communicate with [defendant] ... during that time period. ...
 

 [DEFENSE COUNSEL]: I don't know how I would communicate with [defendant] unless he's in there with me. It's a little much to walk back and forth ....
 

 THE COURT: ... [T]he statute contemplates that [defendant] would not be physically present with you [in the room with Tara], but we could try to make arrangements, if it's allowed, to be closer. In other words, ... so the walk maybe isn't quite as far[.] ... [T]he statute ... contemplates that ... you would need to have access to [defendant], to consult with him throughout ....
 

 It says, "and has the ability to communicate privately with the defendant during the testimony." So we need to make sure [defendant] is at least close to you.
 

 ....
 

 THE COURT: ... [I]f it's your thinking[, defense counsel,] that ... you don't wish to be present [in the room with Tara], that's fine. That's your choice. And if you want to question [Tara] from [the courtroom], that's fine. If [defendant] wants to do it from [the courtroom], then he has that option. If he wants [defense counsel] to go into the room
 
 *860
 
 with [Tara] during the
 
 *756
 
 entire direct and cross ... obviously you have got that option. That's your choice.
 

 In terms of where the room is[ ] ....
 

 Is there an[ adjacent] room ... where [defendant,] or out in the hallway[,] where [defendant] could sit in a chair, ... close by?
 

 ....
 

 THE COURT: ... [T]he Deputy is indicating somewhere in the hallway would work, somewhere close by.
 

 ....
 

 THE COURT: Just make sure [Tara]'s in the room first, and then [defendant] ... can head over just a few steps away outside into the hallway.
 

 ....
 

 THE COURT: ... So [the prosecutor] want[s] to have the assistant holding [Tara]? Then are you also intending to have the interpreter there?
 

 [PROSECUTOR]: Yes, sir. I think just from the chairs and the setup, it would be easiest if [the support person] sat in the blue chair and put [Tara] on her lap. So [Tara] would be far enough up that we could see her the best way possible, and then the interpreter could sit or stand next to her[.] ...
 

 THE INTERPRETER: I probably would sit right behind her.
 

 ....
 

 THE COURT: ... I will allow [Tara] to sit on the [support] person's lap and have the interpreter there.
 

 ....
 

 [PROSECUTOR]: Okay. The first thing[ ] ... logistically we need to know is whether [defense counsel] prefers to stay in [the courtroom], like I am going to do, or prefers to go in the room with [Tara].
 

 [DEFENSE COUNSEL]: I prefer to be in the room with [Tara].
 

 *861
 
 After this conference, the trial court brought out the jury and explained:
 

 THE COURT: [The prosecutor] wants to recall [Tara], and [she] will be testifying by different means. And I have ... made arrangements for ... [defense counsel,] and for [defendant] to be close by ..., in a remote room where there will be questions and responses. And [defense counsel] will be in the room with [Tara], though [defendant] will not be in the room but very close by. ...
 

 So we will ... excuse [defense counsel] and [defendant]. And ... the [prosecutor is] going to be questioning ... [Tara] from the courtroom. So [defense counsel] will be present [with Tara] but [the prosecutor is] going to be in the courtroom with us.
 

 As reflected, although the trial court failed to issue a written order, it thoughtfully considered N.C. Gen. Stat. § 15A-1225.1(d)'s enumerations, and defendant does not allege any prejudice resulting from the trial court's consideration or application of those enumerations in its ruling. Accordingly, we overrule this challenge.
 

 IV. Motions to Dismiss
 

 Defendant next contends the trial court erred by denying his motions to dismiss both charges for insufficient evidence. We disagree.
 

 A. Standard of Review
 

 We review
 
 de novo
 
 the denial of a motion to dismiss for insufficient evidence.
 
 State v. Barnett
 
 ,
 
 368 N.C. 710
 
 , 713,
 
 782 S.E.2d 885
 
 , 888 (2016) (citation omitted). Such a motion "is properly denied if substantial evidence exists to show: (1) each essential element of the offense charged" and "(2) that defendant is the perpetrator of such offense."
 
 Godley
 
 ,
 
 234 N.C. App. at 568
 
 ,
 
 760 S.E.2d at 290
 
 (citation and quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Brown
 
 ,
 
 310 N.C. 563
 
 , 566,
 
 313 S.E.2d 585
 
 , 587 (1984) (citation omitted).
 

 "It is well settled that upon a motion to dismiss in a criminal action, all the evidence admitted, whether competent or incompetent, must be considered by the trial judge in the light most favorable to the State, giving the State the benefit of every reasonable inference that might be drawn therefrom."
 

 Id.
 

 Further, "[i]f a motion to dismiss calls into question the sufficiency of circumstantial evidence, the issue for the court is
 
 *862
 
 whether a
 
 *757
 
 reasonable inference of the defendant's guilt may be drawn from the circumstances."
 
 State v. Vause
 
 ,
 
 328 N.C. 231
 
 , 237,
 
 400 S.E.2d 57
 
 , 61 (1991) (citation omitted).
 

 B. First-degree Sex Offense Charge
 

 Defendant first contends the trial court erred by denying his motion to dismiss the first-degree sex offense with a child charge on the ground that the State presented insufficient substantial evidence that he digitally penetrated Tara.
 

 "A person is guilty of statutory sexual offense with a child by an adult if the person is at least 18 years of age and engages in a sexual act with a victim who is a child under the age of 13 years."
 
 N.C. Gen. Stat. § 14-27.28
 
 (a) (2015). " 'Sexual act' means" in relevant part "the penetration, however slight, by any object into the genital ... opening of another person's body[.] ..."
 

 Id.
 

 § 14-27.20 (2015). A finger is an "object."
 
 State v. Smith
 
 ,
 
 180 N.C. App. 86
 
 , 95,
 
 636 S.E.2d 267
 
 , 273 (2006) (" 'Any object' in this context includes ... a finger." (citation omitted)).
 

 During Tara's remote testimony, she demonstrated by inserting her finger into a hole which the interpreter created with her hand, that defendant digitally penetrated her vagina and confirmed that her demonstration showed "what [defendant] did with his finger in [her] body." When asked "[h]ow did that feel physically on your body," Tara replied: "Bad" and then clarified that "[i]t hurt." Tara confirmed that no one "else ever touched [her] the way [defendant] touched [her] in [her] private part." When asked where "[defendant] touched [her] private part and put his finger in it," Tara replied: "In the living room." When asked whether she was clothed, Tara replied that her clothes were off and that defendant had undressed her. Dr. Cerjan performed a genital examination of Tara one day after the incident. He testified that during his examination, he discovered that Tara's hymen was substantially missing, which he opined was irregular for a six-year-old, and that "the only thing that would cause it would be a penetrating injury." He also observed "redness actually in [Tara's] vaginal area ... behind where the hymen was," which indicated the penetrating injury would have occurred "within the last 48 hours."
 

 Moreover, the State presented overwhelming corroborative evidence from which to reasonably infer that defendant digitally penetrated Tara. Responding officer Sgt. Shockley testified that Tara reported to him that defendant " 'was rubbing [her] down there' " and then "pointed toward ... her genital area." Det. Proctor testified that Tara reported to him that defendant "had gotten on top of her," "had taken her clothes off
 
 *863
 
 and that [defendant] ... was naked," and that defendant "had touched her in her cootie with his hands." Dr. Cerjan testified that Tara reported that defendant "took [her clothes] off," "touched her with ... his hands," and then "pointed to her groin." Accordingly, the trial court did not err in denying defendant's motion to dismiss the first-degree sexual offense with a child charge for insufficient evidence.
 

 Defendant also contends the trial court erred by denying his motion to dismiss this charge because the State failed to present evidence that he digitally penetrated Tara within the time frame specified in the indictment, August 2014. However, at trial, defendant only moved to dismiss this charge on the basis that the State failed to present substantial evidence of penetration, not that the State failed to present evidence that he penetrated Tara during August 2014. Because defendant never moved to dismiss this charge on the ground that there existed a fatal variance between the trial evidence and the indictment, he waived his right to appellate review of this issue.
 
 See
 

 State v. Jones
 
 ,
 
 223 N.C. App. 487
 
 , 495-497,
 
 734 S.E.2d 617
 
 , 623-24 (2012) (dismissing alleged indictment variance error as unpreserved where the defendant moved to dismiss for insufficient evidence but not on the grounds of a fatal variance between the trial evidence and indictment),
 
 aff'd
 
 ,
 
 367 N.C. 299
 
 ,
 
 758 S.E.2d 345
 
 (2014). Accordingly, we dismiss this challenge.
 

 C. Indecent Liberties Charge
 

 Defendant next contends the trial court erred by denying his motion to dismiss the indecent liberties charge because the
 
 *758
 
 State failed to present sufficient evidence he committed an act of indecent liberties. We disagree.
 

 The essential elements of indecent liberties with a child under
 
 N.C. Gen. Stat. § 14-202.1
 
 (a) (2015) follow:
 

 (1) the defendant was at least 16 years of age, (2) he [or she] was five years older than his [or her] victim, (3) he [or she] willfully took or attempted to take an indecent liberty with the victim, (4) the victim was under 16 years of age at the time the alleged act or attempted act occurred, and (5) the action by the defendant was for the purpose of arousing or gratifying sexual desire.
 

 State v. Rhodes
 
 ,
 
 321 N.C. 102
 
 , 104-05,
 
 361 S.E.2d 578
 
 , 580 (1987) (citation omitted).
 

 Defendant only challenges element three: that he took or attempted to take an indecent liberty with Tara. Having concluded above that the
 
 *864
 
 State presented substantial evidence that defendant digitally penetrated Tara, this same act supports the challenged element of this offense.
 
 See
 

 State v. Swann
 
 ,
 
 322 N.C. 666
 
 , 667-78,
 
 370 S.E.2d 533
 
 , 539-40 (1988) (holding that the same act may support convictions and sentences for both first-degree sex offense and indecent liberties). Accordingly, the trial court did not err in denying the motion to dismiss the indecent liberties charge for insufficient evidence.
 

 V. Improper Closing Remarks
 

 Defendant next contends the trial court erred by failing to intervene
 
 ex mero motu
 
 when the State argued during its closing argument to the jury impeachment/corroborative evidence as substantive evidence. We disagree.
 

 "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu
 
 ."
 
 State v. Waring
 
 ,
 
 364 N.C. 443
 
 , 499,
 
 701 S.E.2d 615
 
 , 650 (2010) (citation and quotation marks omitted). "Under this standard, only an extreme impropriety on the part of the prosecutor will compel [an appellate court] to hold that the trial judge abused his discretion in not recognizing and correcting
 
 ex mero motu
 
 an argument that defense counsel apparently did not believe was prejudicial when originally spoken."
 
 State v. Anthony
 
 ,
 
 354 N.C. 372
 
 , 427,
 
 555 S.E.2d 557
 
 , 592 (2001) (citation, quotation marks, and brackets omitted). "To establish such an abuse, [the] defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair."
 
 Waring
 
 ,
 
 364 N.C. at 499-500
 
 ,
 
 701 S.E.2d at 650
 
 (citation and quotation marks omitted).
 

 "Generally, prosecutors are given wide latitude in the scope of their argument and may argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom."
 
 State v. Goss
 
 ,
 
 361 N.C. 610
 
 , 626,
 
 651 S.E.2d 867
 
 , 877 (2007) (citations and internal quotation marks omitted). During closing argument, a prosecutor "may, ... on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue"; however, a prosecutor "may not ... express his [or her] personal belief as to the truth ... of the evidence or as to the guilt ... of the defendant[.] ..." N.C. Gen. Stat. § 15A-1230(a) (2015). Additionally, arguing corroborative or prior-inconsistent-statements to the jury is error.
 
 See, e.g.
 
 ,
 
 State v. Easterling
 
 ,
 
 300 N.C. 594
 
 , 604,
 
 268 S.E.2d 800
 
 , 806 (1980) ("The statement having been offered
 
 *865
 
 only corroboratively, it was improper for the State to allude to it as substantive evidence during closing argument." (citation omitted));
 
 State v. Tucker
 
 ,
 
 317 N.C. 532
 
 , 544,
 
 346 S.E.2d 417
 
 , 424 (1986) ("Although it was proper to cross-examine defendant concerning his prior convictions on the question of his credibility, these convictions were not admissible as substantive evidence tending to prove his guilt. It was error for the trial court to permit the prosecutor to argue as if they were.").
 

 Here, defendant challenges the following argument the State made to the jury:
 

 [Defendant] was naked. [Tara] was naked. He was hovering over her playing with himself which his sister demonstrated and the child demonstrated and the sister said with his finger in her vagina. That ladies
 
 *759
 
 and gentlemen, is proof beyond a reasonable doubt. It's frankly proof beyond every doubt.
 

 To the extent these statements came solely from Sara's and Tara's out-of-court statements that were inconsistent with their trial testimony, the prosecutor inappropriately recited those statements as substantive evidence. However, "[t]o merit a new trial, the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair."
 
 State v. Phillips
 
 ,
 
 365 N.C. 103
 
 , 136,
 
 711 S.E.2d 122
 
 , 146 (2011) (citation and internal quotation marks omitted). To this end, defendant, without citing to any legal authority, advances the following argument: "The [prosecutor] argued to the jury, with the tacit approval of the trial judge, that [Sara's] and [Tara's] out of court statements were sufficient for them to find defendant guilty beyond a reasonable doubt, even 'beyond any doubt.' But for the [prosecutor]'s improper prejudicial closing argument, the jury would have reached a different verdict."
 

 In light of the substantive evidence elicited from Tara's remote testimony, the trial court's later instruction limiting the jury from considering prior-inconsistent-statements as substantive evidence, and the other overwhelming evidence of his guilt, we conclude that defendant has failed to "carr[y] the heavy burden of showing that the trial court erred in not intervening on his behalf."
 
 State v. Thompson
 
 ,
 
 188 N.C. App. 102
 
 , 110,
 
 654 S.E.2d 814
 
 , 819 (2008). Accordingly, we overrule this challenge.
 

 VI. Conclusion
 

 Although the trial court failed to follow N.C. Gen. Stat. § 15A-1225.1's procedural requirements, defendant has failed to demonstrate how he
 
 *866
 
 was prejudiced by any of these alleged procedural errors. Because the State presented substantial evidence of the challenged elements of both crimes, the trial court properly denied defendant's motions to dismiss those charges for insufficient evidence. Finally, although the prosecutor erred to the extent it may have argued prior-inconsistent statements to the jury, defendant failed to satisfy his burden of demonstrating how this argument rendered the proceedings fundamentally unfair. Accordingly, the trial court did not abuse its discretion by failing to intervene
 
 ex mero motu
 
 during the State's closing argument.
 

 NO PREJUDICIAL ERROR.
 

 Judges DIETZ and INMAN concur.
 

 [1]
 

 Pseudonyms are used to protect identities and for ease of reading.